UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

**PATRICIA AIGBOHAN, ET AL.,**

   Plaintiffs,

v.                                                No. 4:24-cv-00733-P

**LIFECARE 2.1, LLC,**

   Defendant.

## MEMORANDUM OPINION & ORDER

Before the Court are Defendant Lifecare 2.1, LLC's (Lifecare) Motion for Summary Judgment (ECF No. 52) and Motion to Strike Plaintiffs' Summary Judgment Evidence (ECF No. 58). Having reviewed the briefing and applicable law the Court will **GRANT** the Motion for Summary Judgment and **DENY as moot** the Motion to Strike.[1]

## BACKGROUND

Lifecare is the operating entity for certain hospitals in North Texas. These hospitals provided extended medical and rehabilitative care to patients with complex, chronic conditions. In January 2024, Lifecare operated three long-term care hospitals in North Texas: (1) Lifecare Hospital of Plano; (2) Lifecare Hospital of Dallas; and (3) Lifecare Hospital of Fort Worth. Only Lifecare Hospital of Plano remains open.

Throughout 2023 and into early 2024, Lifecare's management team took numerous steps to address financial difficulties and avoid any interruption in operations in its facilities and in particular, disruption of operations at Lifecare Hospital of Fort Worth. These steps included: (1) actively seeking additional capital and financial support; (2) negotiating with vendors and suppliers for more favorable payment

---

[1]While the Court agrees with a majority of the arguments contained in Lifecare's Motion to Strike, the evidence does not move the needle and, thus, it is unnecessary for the Court to rule on that motion.

terms; (3) exploring strategic alternatives; and (4) operational plans and projections for continued business into 2024 and beyond. On or about November 17, 2023, Lifecare was notified that its lender would begin decreasing advance rates on a weekly basis.

Lifecare's lender had previously provided financial support when needed and had not indicated any intent to withdraw funding necessary to operate the Fort Worth hospital. In the months leading up to the closure, Lifecare faced mounting financial challenges, including escalating costs for labor, supplies, equipment, and pharmaceuticals, which far outpaced Medicare reimbursements. In early February 2024, these financial constraints ultimately began to cripple the hospital's ability to deliver even the most essential treatments to patients—let alone meet payroll obligations for its critical staff. Lifecare encountered increasing obstacles to patient admissions due to changes in Medicare eligibility guidelines and the prevalence of Medicare Advantage plans, further undermining its ability to maintain a full patient census.

On or about February 19, 2024, the patient census at the Fort Worth facility reached a historic low. Given the reduced patient volume, the hospital no longer required full staffing levels. Accordingly, in an attempt to avoid layoffs, Lifecare implemented a flexed scheduling model to manage payroll obligations, including shift cancellations and work hour reductions. On or about February 26, 2024, Lifecare was notified of the enforcement of the facility lease requiring Lifecare to vacate within ten days. Lifecare had previously received notices of default. However, Lifecare continued making partial payments, and the landlord had never previously taken steps to repossess or terminate the lease. Within less than twenty-four hours of receiving the Notice to Vacate, on the following afternoon of February 27, 2024, Lifecare provided written notice to all affected employees informing the employees of the hospital's closure and their resulting termination.

Plaintiffs then filed this suit on August 2, 2024, alleging that Lifecare violated the WARN Act's requirement that sixty-days' notice of a mass layoff must be given to affected employees. Lifecare filed a Motion for Summary Judgment on June 30, 2025. That Motion has been fully briefed and is ripe for review.

2

## LEGAL STANDARD

Summary judgment is appropriate when "there is no genuine dispute as to any material fact" and the moving party "is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A dispute is "genuine" if the evidence presented would allow a reasonable jury to return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 242–43 (1986). A fact is "material" if it would affect the case's outcome. Id. at 248. Generally, the "substantive law will identify which facts are material," and "[f]actual disputes that are irrelevant or unnecessary will not be counted." *Id.*

When determining whether summary judgment is appropriate, the Court views the evidence in the light most favorable to the nonmovant. *See First Am. Title Ins. Co. v. Cont'l Cas. Co.*, 709 F.3d 1170, 1173 (5th Cir. 2013). In conducting its evaluation, the Court may rely on any admissible evidence of record, but it need only consider those materials cited by the parties. FED. R. CIV. P. 56(c)(1)–(3). And the Court need not mine the record to find evidence to support the non-movant; the burden falls on the movant to simply show a lack of evidence supporting the nonmovant's case. *See Malacara v. Garber*, 353 F.3d 393, 404–05 (5th Cir. 2003).

## ANALYSIS

The WARN Act requires covered employers who are planning a plant closing or mass layoff to give affected employees sixty-days' notice of such action. 20 C.F.R. § 639.2. The purpose of the advance-notice requirement is to provide "workers and their families some transition time to adjust to the prospective loss of employment, to seek and obtain alternative jobs and, if necessary, to enter skill training or retraining." *Id.* § 639.1. Although providing advance notice was the impetus behind it, *see Watson v. Mich. Indus. Holdings, Inc.*, 311 F.3d 760, 765 (6th Cir. 2002) (noting that Congress enacted the WARN Act in response to the extensive worker dislocation of the 1970's and 1980's when companies were merged, acquired, or closed without notice), the WARN Act recognizes that advance notice cannot always be ensured. Accordingly, the Act carves out three exceptions to the notice requirement. *See id.* §

3

639.9. If one of these exceptions applies, employers are required to give only "as much notice as is practicable." *Id.* In this case, the Parties do not dispute that Plaintiffs have made out a *prima-facie* case. Rather, the crux of their dispute is whether the unforeseeable-business-circumstance exception applies to excuse Lifecare's failure to provide its employees with the required sixty-days' notice. Lifecare claims that the closing was unforeseeable. Plaintiffs argue the opposite.

The unforeseeable-business-circumstance exception applies when the closing or layoff was "caused by business circumstances that were not reasonably foreseeable as of the time that notice would have been required." 29 U.S.C. § 2102(b)(2)(A); *see also* 20 C.F.R. § 639.9(b). Thus, an employer must prove two elements to invoke the exception: (1) the circumstances complained of were unforeseeable; and (2) the circumstances complained of actually caused the mass layoff or plant shutdown. *Calloway v. Caraco Pharm. Labs., Ltd.*, 800 F.3d 244, 251 (6th Cir. 2015) (citation omitted). In this case, the Parties only contest the first element—whether the circumstances were foreseeable.

Closings and layoffs are unforeseeable when "caused by some sudden, dramatic, and unexpected action or condition outside the employer's control." 20 C.F.R. § 639.9(b)(1). Examples of unforeseeable events provided by the regulations include "a principal client's sudden and unexpected termination of a major contract with the employer, a strike at a major supplier of the employer, and an unanticipated and dramatic major economic downturn." 20 C.F.R. § 639.9(b)(1); *see also Carpenters Dist. Council of New Orleans & Vicinity v. Dillard Dept. Stores, Inc.*, 15 F.3d 1275, 1282 (5th Cir. 1994). However, because the regulations cannot address every potential unforeseeable circumstance, courts have concluded that the applicability of the unforeseen-business-circumstances exception requires a highly factual inquiry to be assessed on a case-by-case basis. *See, e.g., Mwarabu v. Penncro Assocs., Inc.*, No. 4:15-CV-00160, 2017 WL 367543, at *3 (S.D. Tex. Jan. 24, 2017). In assessing the foreseeability of business circumstances in any particular situation, the court must focus "on an employer's business judgment." 20 C.F.R. § 639.9(b)(2). An employer is required only to "exercise such commercially reasonable business

4

judgment as would a similarly situated employer in predicting the demands of its particular market." *Id.*

Because the WARN Act is not intended to deter companies from fighting to stay afloat, courts must look "to whether Defendant's judgment was reasonable at the time decisions were made, not at whether Defendant's judgment ultimately proved to be correct." *Mwarabu*, 2017 WL 367543, at *4. As several courts have explained:

> WARN was not intended to force financially fragile, yet economically viable, employers to provide WARN notice and close their doors when there is a *possibility* that the business may fail at some undetermined time in the future. Such a reading of the Act would force many employers to lay off their employees prematurely, harming precisely those individuals WARN attempts to protect. A company that is struggling to survive financially may be able to continue on for years and it was not Congress's intent to force such a company to close its doors to comply with WARN's notice requirement.

*Id.* (citations omitted).

Rather, courts recognize that "[f]ree enterprise always involves risk . . . . Business downturns in a cyclical economy are not unusual, and we should not burden employers with the 'task of notifying employees of possible contract cancellation and concomitant lay-offs every time there is a cost overrun' or similar difficulty." *Gross v. Hale–Halsell Co.*, 554 F.3d 870, 877 (10th Cir. 2009) (quoting *Halkias v. Gen. Dynamics Corp.*, 137 F.3d 333, 336 (5th Cir. 1998)). Consequently, courts have made clear that "where it only is possible that the business circumstance at issue may occur, such circumstances are not reasonably foreseeable." *In re Flexible Flyer Liquidating Trust*, 511 Fed. App'x 369, 373 (5th Cir. 2013). "Rather, it is the probability of occurrence that makes a business circumstance reasonably foreseeable and thereby forecloses use of the [unforeseeable-business-circumstances] exception." *Id.* (alteration in original). As a result, "an employer does not have to be caught completely off guard by a dire business circumstance for it to be 'sudden, dramatic, or unexpected.'" *Roquet v. Arthur Andersen LLP*, 398 F.3d 585, 590 (7th Cir. 2005) (collecting cases).

5

In this case, Lifecare admits that it was facing serious financial struggles. *See* ECF No. 53 at 2–4, 10–12. However, Lifecare asserts that its landlord's February 26, 2024 eviction letter—which required it to vacate the premises in ten days—was unexpected. *Id.* at 10–12. In support, Lifecare points to the fact that it had previously received notices of default but that the landlord had never taken any steps to terminate the lease due to its continuing to make partial payments. *Id.* at 4. Lifecare notified the employees within twenty-four hours of receiving the ten-day eviction notice. *Id.* at 12. Thus, Lifecare argues that unforeseeable-business-circumstance exception should apply because the closure was unforeseeable and out of their control.

In response, Plaintiffs argue that the eviction was not unexpected at all. ECF No. 53. In support, Plaintiffs point to three affidavits[2] submitted with their Response and Lifecare's admitted financial struggles. *Id.* Plaintiffs claim that if the Court consider their affidavits (which Lifecare asserts it should not) the following is established:[3]

> (1) Defendant's financial constraints occurred throughout 2023 and 2024; (2) Defendant was seeking additional capital and financial support, but its lender was reducing its advance rates in November and December of 2023; (3) Defendant was in default in paying its rent as early as July 18, 2023, and Defendant had failed to cure the defaults; (4) Defendant's staffing

---

[2]The Court notes that the three affidavits perfectly surmise Plaintiffs' complete failure to participate in discovery, comply with the Rules of Civil Procedure, or follow this Court's orders. The first affidavit is the affidavit of Chaz Turner. ECF No. 56-1 at 3–4. Chaz Turner is not a party to this case, and he was never identified by Plaintiffs' counsel as a person with knowledge of relevant facts. Furthermore, his affidavit describes a business relationship between his company (not a party) and another non-party entity. Thus, it is completely irrelevant. The second affidavit is the affidavit of Joanne Johnson. *Id.* at 11–13. Johnson's affidavit reiterates many of the financial struggles admitted to by Lifecare. However, it is full of statements not supported by personal knowledge, many of which are subjective and inflammatory. The third affidavit is the affidavit of Cassie Holl. *Id.* at 15–17. Holl's affidavit is comprised of mostly irrelevant and inadmissible statements. However, worst of all, it is not signed nor sworn to. *Id.*

[3]The Court omitted points 5 and 12, as they involve non-party companies and are not relevant.

6

>agencies had pulled staff out of the hospital; (6) Water cut-off notices were being received by the receptionist or were posted to the front door; (7) Creditors of the hospital had been calling for over a year trying to get paid; (8) Creditors had been coming to the hospital lobby trying to collect past due invoices; (9) Chris LeBlanc was attempting to dodge creditors in the lobby of the hospital; (10) Creditors called and emailed the receptionist on a daily basis regarding unpaid bills for many months; (11) Doctors who cared for Defendant's patients were not paid on time during 2023-2024. They sometimes had to come into the hospital to pick up their checks; (13) A couple of times, employees' paychecks were delayed; (14) Mr. LeBlanc was forced to hold a meeting with the employees to reassure them about the hospital's future; (15) Defendant was losing office suppliers; (16) The hospital's pharmacy supplier was cutting off supplies.

ECF No. 56 at 10–11.

Even, assuming *arguendo*, that all of the aforementioned are true, Plaintiffs have failed to show that the closure was reasonably foreseeable as the Court finds this case analogous to *Flexible Flyer*. In *Flexible Flyer*, the company consistently operated in a deficit from 2000 to 2005. 511 F. App'x at 370. The company's situation became worse in 2005, when it experienced "a number of financial problems," and "two months later, [the company] was forced to recall" millions of dollars in go-carts due to a defective part. *Id.* at 371. The company took and was discussing various steps to mitigate the losses and to stay afloat, including seeking early payments from customers, negotiating with vendors, and making presentations to major clients for future business. *Id.* However, before the company decided on an ultimate course of action, its main funder reduced its credit line and then later completely severed the line of credit. *Id.* As a result, two days later, the company was forced to close and lay-off more than 100 employees. *Id.* at 372. The Fifth Circuit found that management's focus was on saving the company and not planning for an imminent shutdown. *Id.* at 372–73. Ultimately, the Fifth Circuit held that all though the financial situation of the company had long been suspect, the closure was triggered by the sudden and unexpected loss of funding.

In this case, Lifecare was faced with a similarly bleak financial situation. And Lifecare's management was similarly making an effort to continue operations. Specifically, management sought out additional financing, was negotiated with creditors, and was attempting to establish payment plans for critical obligations, including overdue property taxes and contract labor invoices. During all of this, Lifecare entered a state of default on its lease in July 2023. This default prompted the landlord to issue Lifecare multiple default notices. But, because Lifecare continued to make partial payments, the landlord did not take any steps to terminate the lease or evict Lifecare. Subsequently, in November 2023, Lifecare's main creditor notified Lifecare that, while it would be willing to discuss strategic initiatives going forward, it would begin decreasing Lifecare's credit line. However, on February 26, 2024, Lifecare received notice from its landlord that its lease was being terminated and that it needed to vacate the facility in ten days. Lifecare notified its employees less than twenty-four hours later that it would be closing.

It cannot be disputed that there was a possibility that Lifecare would be evicted. But that is not enough. Courts have held that even when a company's management had actual knowledge of the potential critical event—a contract's cancellation—the circumstance's occurrence was not reasonably foreseeable. *Halkias v. Gen. Dynamics Corp.*, 137 F.3d 333, 336 (5th Cir. 1998). The Fifth Circuit held that while cancellation of the contract was a possible outcome, it was not a probable one because whether the contract was canceled "was a circumstance outside of [management's] control." *Flexible Flyer*, 511 F. App'x at 373 (citing *Halkias*, 137 F.3d at 336); *see also Carpenters Dist. Council of New Orleans v. Dillard Dep't Stores, Inc.*, 15 F.3d 1275, 1281–82 (5th Cir. 1994) (finding that the potential critical event—merger due to declining profits— was foreseeable where the employer planned the closure in negotiating and ultimately reaching a merger agreement between two corporations, and therefore was in control of the circumstances precipitating the mass layoffs). Therefore, based on this binding precedent, the Court holds that the eviction, while possible, was not probable. Furthermore, Plaintiff has provided no evidence to show that

8

Lifecare did not exercise "commercially reasonable business judgment as would a similarly situated employer in predicting the demands of its particular market." 20 C.F.R. § 639.9(b)(2). Consequently, the Court finds the eviction was a sudden and unexpected event outside of the Lifecare's control and the unforeseeable-business-circumstance exception applies.

In a last-ditch effort to save their claims, Plaintiffs assert that Lifecare is a "sophisticated business" that would have understood it could delay the eviction by forcing the landlord to file a "forcible detainer suit under Chapter 24 of the Texas Property Code, which requires notice and the possibility of an appeal, all of which could easily take more than 60 days." ECF No. 56 at 5. Other than their attorney's assertions, Plaintiffs offer no evidence or expert opinion to support this. Nor do they cite to any cases in which a court decided not to apply the unforeseeable-business-circumstance exception because a similar delay tactic was available. Plaintiffs simply ask the Court to punish Lifecare for complying with its lease rather than running to court. That argument is unavailing and Lifecare is entitled to summary judgment.

## CONCLUSION

Based on the foregoing, Lifecare's Motion for Summary Judgment is **GRANTED** and the Motion to Strike is **DENIED as moot**. Therefore, Plaintiffs' claims are **DISMISSED with prejudice**.

**SO ORDERED** on this **26th day of August 2025.**

MARK T. PITTMAN
UNITED STATES DISTRICT JUDGE